[Cite as *Fether v. Conkey*, 2013-Ohio-3196.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

RUTH FETHER, ET AL.,

    PLAINTIFFS-APPELLANTS,             CASE NO.  4-13-01

    v.

RAYMOND D. CONKEY, JR., ET AL.,        O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Defiance County Common Pleas Court
Probate Division
Trial Court No. 16680A

**Judgment Affirmed**

**Date of Decision:   July 22, 2013**

APPEARANCES:

    *Richard Kolb and Daniel McQuade*  for Appellants

    *Stephen K. Snavely*  for Appellee Conkeys

    *Marc F. Warncke*  for Appellee Sinn

**SHAW, J.**

{¶1} Plaintiffs-appellants Ruth Fether, Sherrie Barnes, and Teresa Dew (collectively, "appellants") appeal the December 14, 2012, judgment of the Defiance County Common Pleas Court, Probate Division, granting summary judgment to defendants-appellees Raymond D. Conkey, Jr., Linda K. Conkey, and Barbara Sinn, individually and as Executor of the Estate of Kermit Ridenour, in a will contest case.

{¶2} This case involves the last will and testament of Kermit L. Ridenour ("Ridenour"), two codicils amending that will, and Ridenour's beneficiary designations on selected annuities. Ridenour was diagnosed with cancer in April of 2008. After receiving his diagnosis, Ridenour began working with attorney James Weaner to get his estate plan in order.

{¶3} On April 10, 2008, Ridenour executed a General Power of Attorney designating his friend and neighbor Barbara Sinn ("Sinn") as his attorney-in-fact, giving Sinn authority to handle Ridenour's business affairs in the event that Ridenour became disabled.[1]

{¶4} On May 6, 2008, Ridenour executed his Last Will and Testament at attorney James Weaner's office. The will made a specific bequest of Ridenour's

---

[1] On that same date, Ridenour also executed a Durable Power of Attorney for Health Care, designating Sinn as his health care agent, with Ray named as the alternate. At that same time, Ridenour also executed a Living Will Declaration which designated Sinn and Ray as the persons to be notified if his physicians intended to discontinue life sustaining treatment.

two 80-acre farms to Ray Conkey, Jr. ("Ray") and his wife Linda Conkey ("Linda"), or their survivor. Ray had been Ridenour's tenant-farmer since Ridenour retired from farming, and Ridenour considered Ray to be like a son to him. (Sinn Depo. at 48). Ray had known Ridenour all his life, they attended church together and were "very close friends." (Ray Depo. at 23). In addition, Ridenour and Ray Conkey, Sr. had been lifelong friends since childhood. Ridenour had no children, was never married, and his closest living relatives were his sister, Ruth Fether, and her children, Teresa Dew and Sherrie Barnes. Aside from the farms, the remainder of Ridenour's estate in his will was left to his sister, Ruth Fether.

{¶5} Over the course of the next two years, Ridenour received treatment for his cancer while he lived independently on one of his farms. On or about April 6, 2010, Ridenour received news that there was nothing else that could be done for his cancer, so he voluntarily entered a hospice facility in Defiance, Ohio. Shortly after entering into the hospice facility, Ridenour executed two codicils, the first dated April 7, 2010, and the second dated April 12, 2010. The codicils distributed certain items of personal property and made monetary bequests to Ridenour's church and to a cemetery.

{¶6} Appellants in this case claim that prior to the execution of the second codicil, a discussion was had at the hospice facility between Ridenour and

appellants wherein Ridenour decided that he would alter his will to leave the farms to appellants. Neither codicil changed the will with regard to the two 80 acre farms or addressed the farms in any manner.

{¶7} On June 9, 2010, and June 25, 2010, Ridenour changed the beneficiaries of two annuities to his estate.

{¶8} On August 26, 2010, Ridenour died at the hospice facility. On August 31, 2010, his last will and testament, as modified by the two codicils, was admitted to probate and Sinn was appointed as the estate executor.

{¶9} On December 16, 2010, appellants filed a complaint against Sinn, and the Conkeys, asserting that the will and codicils were procured as a result of undue influence. (Doc. 1).

{¶10} On January 10, 2011, the Conkeys filed an answer. (Doc. 19). On February 15, 2011, Sinn filed an answer. (Doc. 32).

{¶11} Subsequently, discovery was conducted. During the course of discovery, depositions were taken of attorney James Weaner, Ruth Fether, Teresa Dew, Sherrie Barnes, Ray, Linda, Sinn, and Donald Suffel.

{¶12} On January 31, 2012, the Conkeys filed a motion for summary judgment asserting that absolutely no evidence was in the record that would establish "undue influence." (Doc. 63). On that same date, Sinn filed a motion for summary judgment making similar arguments, adding that the record contained

evidence that Sinn had actually advised Ridenour *against* leaving the farms to the Conkeys, and that there was no evidence that Sinn had influenced Ridenour or had any motivation or desire to influence Ridenour to leave his farms to the Conkeys. (Doc. 65).

{¶13} On February 27, 2012, appellants filed a response to the summary judgment motions. (Doc. 68). On March 8, 2012, Sinn filed a reply to appellants' response. (Doc. 69).

{¶14} On December 14, 2012, the trial court filed its judgment entry on the matter, granting defendants' motions for summary judgment. The court found that "[s]ince no evidence exists of the exertion or attempt to exert undue influence upon the Decedent as it relates to the execution of any of the * * * documents, this being an essential element of either definition of undue influence, the court finds that there is no genuine issue as to any material fact and that the moving parties * * * are entitled to judgment as a matter of law." (Doc. 73).

{¶15} It is from this judgment that the appellants appeal, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN FINDING NO EVIDENCE WAS PRESENTED TO DEMONSTRATE UNDUE INFLUENCE WAS EXERTED OR ATTEMPTED.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN CITING NO EVIDENCE THAT DEFENDANTS SATISFIED THEIR BURDEN OF**

**GOING FORWARD DUE TO THEIR CONFIDENTIAL AND FIDUCIARY RELATIONSHIP WITH THE DECEDENT.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED IN CONCLUDING THAT NO GENUINE ISSUES OF MATERIAL FACT ARE IN DISPUTE.**

*Summary Judgment Standard*

**{¶16}** Initially, we note that an appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley–Slowinski v. Superior Spinning & Stamping Co.*, 128 Ohio App.3d 360, 363 (6th Dist.1998). A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); *see Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995-Ohio-286, paragraph three of the syllabus.

**{¶17}** The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler*, 38 Ohio St.3d 112, syllabus (1988). The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case.

*Dresher v. Burt*, 75 Ohio St.3d 280, 292, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. *See* Civ.R. 56(E).

*First Assignment of Error*

{¶18} In their first assignment of error, appellants contend that the trial court erred in finding that no evidence was presented that undue influence was exerted in this case. Specifically, appellants contend, *inter alia*, that Sinn's "total involvement" in Ridenour's affairs was evidence of undue influence.

{¶19} R.C. 2107.74 provides in part, "On the trial of any will contest under section 2107.71 of the Revised Code, the order of probate is prima-facie evidence of the attestation, execution, and validity of the will or codicil." As part of this presumption of validity, "[a] presumption arises from the order of admission of the will to probate that the testator was free from restraint. The burden of proving undue influence is upon the contestants * * *." *Krishbaum v. Dillon*, 58 Ohio St.3d 58, 64 (1991), quoting *West v. Henry*, 173 Ohio St. 498, 502 (1962) (construing former R.C. 2741.45, which contains substantively similar language to that currently set forth in R.C. 2107.74).

{¶20} The Ohio Supreme Court has stated that "undue influence to avoid a will must so overpower and subjugate the mind of the testator as to destroy his

free agency and make him express the will of another rather than his own, and the mere presence of influence is not sufficient. Undue influence must be present or operative at the time of the execution of the will resulting in dispositions which the testator would not otherwise have made." *West* at 501. The essential elements of undue influence are: (1) a susceptible testator, (2) another's opportunity to exert influence on the testator, (3) the fact of improper influence exerted or attempted, and (4) a result showing the effect of such influence. *West* at 510–511.

**{¶21}** The trial court found, in analyzing the elements of "undue influence" pursuant to *West*, that there was no evidence of improper influence exerted or attempted in this case. (Doc. 73). The trial court thus found that the third element of "undue influence" under *West* was lacking and that summary judgment was appropriate to award to appellees. The trial court did not explicitly make findings with regard to the remaining elements of *West*, choosing to rest on the fact that appellants failed to meet their burden and produce evidence of undue influence with regard to one of the material elements.

**{¶22}** Appellants argue before this Court that Sinn was heavily involved in the management of Ridenour's affairs and thus could have influenced Ridenour's decision to leave his farms to the Conkeys. According to the appellants, Sinn was completely involved in all aspects of the execution of Ridenour's will and the codicils. Sinn set up the meetings with the attorney and was present for them,

with the exception of the meeting with the attorney before the execution of the second codicil.

{¶23} Evidence in the record established that Sinn was Ridenour's friend and neighbor, and that Sinn had known Ridenour all her life. (Sinn Depo. at 12). It is undisputed that Sinn was given Power of Attorney and named executor under Ridenour's will. Furthermore, it is undisputed that Sinn did not profit under Ridenour's will.[2]

{¶24} Ridenour executed his will in May of 2008, over two years prior to his death. In his will, Ridenour expressed his wish that his farms go to the Conkeys. Sinn testified in her deposition that she was surprised when Ridenour originally told her that he had planned on giving his farms to the Conkeys. (Sinn Depo. at 46-48). According to Sinn, she had assumed Ridenour would leave the farms to his sister, Ruth Fether. (*Id*.) Ridenour, however, told Sinn that Ray was like a son to him. (*Id*. at 48). Sinn testified in her deposition that Ridenour had considered deeding the farms to the Conkeys while Ridenour was alive, but ultimately Ridenour decided against it, based on Sinn's counsel, and left the farms to the Conkeys in his will. (*Id*. at 46).

{¶25} After Ridenour moved into the hospice facility, nearly two years after the execution of his will, Ridenour executed his first codicil, which dealt with

---

[2] While one of the codicils bequeathed Ridenour's car to Sinn, it was a conditional bequest in the event that Ridenour did not give Sinn the car during his life. Ridenour did actually transfer the car to Sinn while he was alive. Thus Sinn did not take anything under Ridenour's will or the codicils.

the distribution of some of Ridenour's personal property but did not alter the disposition of the farms, and did not mention the farms at all. Following the execution of his first codicil, Ridenour was visited in hospice by his sister Ruth, and her daughters Sherrie and Teresa. During that visit, Sinn had a private conversation with Ruth, Sherrie and Teresa. As part of that conversation, Sinn revealed that she was being overwhelmed by people requesting various pieces of personal property of Ridenour's. (Sinn Depo. at 70-71). Sinn then asked if Ruth wanted to be Ridenour's executor, to which Ruth replied that she did not. (Sinn Depo. at 71).

{¶26} Also in that conversation, Sinn informed Ruth, Sherrie, and Teresa that the Conkeys were to receive Ridenour's farms by will. Appellants were surprised by this information, as they had thought that Ridenour had already given the property to the Conkeys and that it was a "done deal." (Barnes Depo. at 27). Ruth testified in her deposition that Ridenour had talked to her about transferring the farms to the Conkeys in 2008, that she did not tell Ridenour he should not transfer the farms to the Conkeys then, and that she thought Ridenour had actually gone through with the transfer.[3] (Ruth Depo. at 20). Despite thinking that the farms had already been given to the Conkeys previously, appellants had not, up to that point, questioned Ridenour about it.

---

[3] Ruth also revealed in her deposition that when she and Ridenour's parents died, Ruth and Ridenour were each left a ½ interest in the farms. (Ruth Depo. at 13). Ruth testified that Ridenour bought out Ruth's interest in those farms. (*Id*.)

-10-

**{¶27}** After conversing with Sinn at the hospice facility, appellants spoke privately with Ridenour in an attempt to persuade Ridenour to leave the farms to Ruth's daughters, with Ray still having the right to lease the land for farming. (*Id.* at 29). The conversation lasted about ten minutes, and according to the appellants, Ridenour agreed to change his will. (*Id.*)

**{¶28}** It is disputed whether Ridenour actually orally agreed that he would alter his will regarding the farms during that conversation or merely agreed to think about it. (Sinn Depo. at 69). But it is clear in the record that following the conversation between appellants and Ridenour a meeting was set with Ridenour's attorney James Weaner so that a second codicil could be prepared.

**{¶29}** Sinn made the appointment with Weaner to draft a second codicil for the following Tuesday, and appellants were supposed to attend; however, Ridenour met with Weaner on the preceding Monday, without Sinn and without appellants present. Weaner testified in his deposition that Ridenour did not mention making any changes regarding the disposition of the farms, and that if Ridenour would have mentioned it, Weaner would have made the changes in the second codicil. (Weaner Depo. at 59-60). Following the meeting between Ridenour and Weaner, a second codicil was prepared and executed. The second codicil did not mention the farms.

{¶30} Sinn testified in her deposition that she did not ask Ridenour what he finally decided to do with his farms and she did not want to know because she did not want to be further involved. (Sinn Depo. at 75). Appellants testified in their depositions that they similarly did not ask Ridenour if he made the changes regarding who would receive the farms. (Barnes Depo. at 37). Max Tappan, Ridenour's cousin, submitted an affidavit that stated Ridenour told Tappan that Ridenour had decided not to change his will despite the conversation with the appellants. (Tappan Aff.).

{¶31} Thus ultimately the evidence established that Ridenour originally desired to give his farms to the Conkeys and put that desire in his will, where it remained despite Ridenour's execution of two codicils. Appellants were aware of Ridenour's desire to leave the farms to the Conkeys as they had actually thought that it was already a "done deal." After learning that the farms were to pass via Ridenour's will, only one conversation occurred that suggested Ridenour considered altering his will, and that conversation occurred over a ten minute period. Appellants now argue on appeal that somehow the *absence* of a change in Ridenour's will is evidence of undue influence by the appellees.

{¶32} There is nothing in the record to suggest that Sinn either influenced or attempted to influence Ridenour toward giving his two farms to the Conkeys. To the contrary, the only evidence in the record is that Sinn initially advised

*against* Ridenour leaving his farms to the Conkeys, instead advising that he give them to his sister Ruth. When Sinn made this statement to Ridenour, Ridenour told Sinn that Ray was like a son to Ridenour. (Sinn Depo. at 48). Ridenour continued by saying "isn't it mine, can't I do with it what I want?" (*Id*. at 49).

{¶33} Similarly, the record merely established Sinn's presence at the meetings with Ridenour's attorney. While Sinn took notes that were occasionally used, there was no indication that she ever influenced Ridenour or attempted to do anything that would go against his wishes. In fact, attorney Weaner testified that he never doubted Ridenour's capacity, that in his opinion there was no undue influence, and that it was not uncommon for someone to bring in a confidant when discussing a will. (Weaner Depo. at 44-45, 63, 78). Weaner's legal assistant Susan Leibold submitted an affidavit stating that Sinn only acted in a supportive role and that she did not attempt to influence Ridenour in any manner. (Leibold Aff.). Leibold also averred that Ridenour appeared to understand the will he was signing and that Ridenour stated he was satisfied with what the will said when it was executed. (*Id*.)

{¶34} With regard to the Conkeys, there is similarly no evidence that they exerted any actual undue influence upon Ridenour. The Conkeys testified that they were shocked and grateful when Ridenour originally told them he was going to give them his farms. (Ray Depo. at 58). The Conkeys testified that following

appellants' visit to hospice, Ridenour did inform the Conkeys that appellants wanted Ridenour to leave his farms to appellants. (*Id.* at 44). The Conkeys both testified that they told Ridenour the farms were his and that he could do what he wanted with them. (*Id.*); (Linda Depo. at 29). There is no evidence that the Conkeys tried to talk Ridenour out of leaving the farms to appellants, or that they had ever attempted to influence Ridenour to leave them the farms when his will was originally executed.

{¶35} Notably, when Ruth Fether was asked who exerted undue influence in this case, she responded, "I don't know." (Ruth Depo. at 51). When Teresa Dew was asked the same question, she said that she did not know who had influenced Ridenour, she just had a suspicion that it had occurred. (Teresa Depo. at 37). When Sherrie Barnes was asked the same question, she said she *suspected* Sinn and the Conkeys of influencing Ridenour, but did not know how. (Sherrie Depo. at 38). Therefore, the only evidence of undue influence in the record is the bald speculation of the appellants.

{¶36} Appellants attempt to support their bald assertion by showing how closely involved Sinn was in Ridenour's estate planning process. However, the evidence shows that Sinn assisted Ridenour in setting up meetings so that Ridenour could execute his estate plan, that Sinn was present for those meetings, and occasionally took notes. There is simply nothing in the record to establish that

Sinn influenced Ridenour's desires in any manner, or that Sinn had any motive to work in conjunction with the Conkeys to influence Ridenour. There is also no evidence that in any of the notes Sinn took that she ever wrote anything contrary to the explicitly expressed wishes of Ridenour. Under these circumstances, we cannot find that there is any evidence in the record to suggest that undue influence was exerted regarding the will or the codicils by Sinn or the Conkeys.

{¶37} Appellants also argue the trial court erred in finding that there was no undue influence exerted by appellees with regard to beneficiary designations of certain annuities. The evidence in the record established that Ridenour was the owner of several annuities, two of which he changed the beneficiary of from appellants to his estate in June of 2010. The remaining annuities were still to go to appellants, and any leftover funds in the estate would still have gone to Ruth as the residuary beneficiary.[4]

{¶38} Evidence established that Ridenour changed the beneficiary on the two selected annuities so that the estate would have enough funds to pay Ridenour's estate expenses and to fund the new monetary bequests added by the two codicils to Ridenour's church and to a cemetery. Donald Suffel, who was Ridenour's insurance agent through which Ridenour originally purchased the annuities several years earlier, testified in his deposition that Ridenour changed the

---

[4] In fact, appellants did receive the annuities that Ridenour did not change the beneficiaries on. (Ruth Depo. at 51). According to Ruth's deposition, each appellant received a little over $100,000 from those annuities. (*Id.*)

beneficiary designations because he wanted some money to leave to the church and the cemetery in his estate. (Suffel Depo. at 29). Suffel also testified that he did not feel Ridenour was pressured in any way to change those designations. (*Id.* at 30). There is simply no evidence in the record that either Sinn or the Conkeys exerted any influence upon Ridenour regarding the annuities or that they attempted to exert any influence upon him. All of the evidence in the record indicates that Ridenour's actions were voluntary.

{¶39} Finally, we would note that there is also no evidence in the record that Ridenour was a "susceptible testator." Appellants attempt to establish that Ridenour was susceptible through Barnes' affidavit wherein she averred that Ridenour was a "follower, not a leader" based on the fact that whenever Ridenour went somewhere with his father in the past, Ridenour's father drove. (Barnes Aff.). Despite this characterization of Ridenour, there is nothing in the record to suggest that being a "follower," Ridenour was actually susceptible to influence. To the contrary, Ruth testified in her deposition that she knew of no instances where Ridenour was convinced to do something that he did not want to do against his will. (Ruth Depo. at 29). Moreover, Ruth testified that when Ridenour was diagnosed with cancer, his mental capacity was good, he was still handling his own affairs and managing his own bills, which he continued to do in the months

following his diagnosis. (*Id.*) This falls within the timeframe that Ridenour originally executed his will.

{¶40} Accordingly, for all of these reasons we cannot find that summary judgment was improperly awarded to appellees. For all of these reasons, appellants' first assignment of error is overruled.

*Second Assignment of Error*

{¶41} In their second assignment of error, appellants contend that the trial court erroneously failed to charge appellees with the initial burden of coming forward with evidence showing that the critical documents were not procured by undue influence. Specifically, appellants argue that a fiduciary and confidential relationship existed between Sinn and Ridenour and between the Conkeys and Ridenour, and that because of these relationships, appellees had the burden of presenting evidence that the transactions were free of undue influence, that Ridenour acted voluntarily, and that Ridenour had a full understanding of his acts and the consequences. Further, appellants contend that the trial court completely failed to address this issue, and that the judgment should therefore be reversed.

{¶42} In making this argument, appellants cite this Court to several cases dealing with situations where there was a confidential and/or a fiduciary relationship between a donor and a donee. *See Fox v. Stockmaster*, 3d Dist. Nos. 13-1-34, 35, 2002-Ohio-2824, *Diamond v. Creager*, 2nd Dist. No. 18819, 2002-

Ohio-916, *In Re Guardianship of Simmons*, 6th Dist. No. Wd-02-39, 2003-Ohio-5416, *Krischbaum v. Dillon*, 58 Ohio St.3d 58 (1991).  Appellants contend that these cases stand for the proposition that when there is a confidential and fiduciary relationship between a donor and a donee, the transfer to the donee is viewed with suspicion and the burden shifts to the donee to show that undue influence was not exerted.

{¶43} Even assuming that the burden had shifted in this case, the evidence presented was sufficient to satisfy any burden placed upon the appellees.  The record affirmatively established Ridenour's desire for his farms to go to the Conkeys through his will itself and through conversations Ridenour had with Sinn, Weaner, the Conkeys, and Max Tappan.  Only during one ten minute conversation did that desire apparently ever waver and that desire was never reduced to writing.  All of the evidence presented indicates that Ridenour's actions were voluntary.  Furthermore, the record establishes that Ridenour was aware of the consequences of his actions as Weaner, his assistant Susan Leibold, and Donald Suffel, all stated that Ridenour fully understood and was satisfied with the documents that he executed.  There is no testimony contradicting these statements.  Therefore, even assuming the relationships in this case might have caused the burden to shift, the appellees satisfied their burden.

{¶44} Accordingly, appellants' second assignment of error is overruled.

*Third Assignment of Error*

{¶45} In appellants' third assignment of error, appellants contend that the trial court erred in awarding summary judgment to the appellees as there were material facts still in dispute. Specifically, appellants argue that the following enumerated facts are still in dispute:

> 1.    **Why did [Ridenour] agree to give the farm to [appellants] and then reverse his position after talking with Conkey and Sinn;**
> 2.    **Why would [Ridenour] give his farm to his tenant farmer when they only had a business relationship over a short period of time;**
> 3.    **Why would [Ridenour] give his centennial farm to a non-relative and thereby lose its centennial status.**
> 4.    **[Appellees] cast the relationship between [Ridenour], Ruth and her daughters in a less positive light than [appellants]. [Appellees] claim that there was little face to face contact with Ruth while [Appellants] claim the opposite.**
> 5.    **Sinn's involvement in the estate plan. Sinn downplays her role in the estate plan when it is clear by Attorney Weaner's testimony that Sinn dominated the plan;**
> 6.    **Sinn claims that she did not know who got the farm after [Ridenour] signed the second codicil. How could she possibly be so uninformed when she had been so totally involved before;**
> 7.    **Conkey claims that he did not press [Ridenour] to give him the farms worth almost $700,000, and that he was not disappointed in losing the farms;**
> 8.    **Sinn says the rush for personal property was precipitated by [Ridenour's] offer to give it away but this is contradicted by complaints of pressure and her willingness to have Ruth serve as executor; and**
> 9.    **Conkey was after [Ridenour's] tools, truck and tractor according to Barnes; a claim Conkey denies even discussing with [Ridenour] until after the second codicil was signed.**

(Appt. Br. 24-25).

{¶46} With regard to the first cited "fact in dispute," Ridenour originally executed his will with the Conkeys as beneficiaries of his farms. Evidence revealed, including through the testimony of the appellants, that Ridenour even considered giving his farms to the Conkeys while he was still alive, but ultimately decided to leave the farms to the Conkeys in his will. The evidence never established that Ridenour affirmatively "reversed his position" as his will left the farms to the Conkeys and there was no evidence of undue influence as we found in the first assignment of error.

{¶47} The second, third, fourth, sixth, and eighth facts claimed to be in dispute are not material to the ultimate disposition of the case and would not preclude summary judgment.

{¶48} With regard to the fifth "fact in dispute," as discussed in the first assignment of error, Sinn's mere presence at meetings and her involvement in setting up those meetings does not show that she "dominated" the estate plan. Characterizing Sinn's presence as "dominating" is not supported in the record.

{¶49} With regard to the seventh "fact in dispute," there is no evidence that Ray pressured Ridenour for the farms.

{¶50} With regard to the ninth "fact in dispute," even assuming Ray was "after [Ridenour's] tools, truck and tractor," which is disputed by the testimony of Sinn and the Conkeys, it has no bearing on Ridenour's decision to leave his farms

to the Conkeys over two years prior in his will, and thus would not preclude summary judgment on that issue.

{¶51} In sum, we cannot find that under these circumstances, any of the facts claimed to be in dispute would preclude summary judgment. Accordingly, appellants' third assignment of error is overruled.

{¶52} For the foregoing reasons, appellants' assignments of error are overruled and the judgment of the Defiance County Common Pleas Court, Probate Division, is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**